

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMIER TADROS, on Behalf of All Others Similarly Situated, | Civil Action No. **07 CV 10442** |
| Plaintiff, | |
| -against- | |
| CITIGROUP INC., CHARLES O. PRINCE, C. MICHAEL ARMSTRONG, ALAIN J.P. BELDA, GEORGE DAVID, KENNETH T. DERR, JOHN M. DEUTCH, ROBERTO HERNANDEZ RAMIREZ, ANN DIBBLE JORDAN, KLAUS KLEINFELD, ANDREW N. LIVERIS, ANNE MULCAHY, RICHARD D. PARSONS, JUDITH RODIN, ROBERT E. RUBIN, ROBERT E. RUBIN, FRANKLIN A. THOMAS, JOHN DOES 1-20 (BEING CURRENT AND FORMER MEMBERS OF THE PLANS ADMINISTRATIVE COMMITTEE OF CITIGROUP INC.) and JOHN DOES 21-40 (BEING CURRENT AND FORMER MEMBERS OF THE INVESTMENT COMMITTEE OF THE CITIGROUP INC. 401(K) PLAN), | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA**  |
| Defendants. | |

Plaintiff Samier Tadros, individually and on behalf of all other persons similarly situated, alleges the following based upon the investigation by Plaintiff's counsel, which included, *inter alia*, a review of public documents filed by Citigroup Inc. ("Citigroup" or the "Company") with the United States Securities and Exchange Commission ("SEC") and the United States Department of Labor ("DOL"), conference calls and announcements made by defendants, securities analysts' reports, wire and press releases published by and regarding the Company, and other publicly available information.

## INTRODUCTION

1.      This is a class action brought pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), on behalf of the

Citigroup 401(k) Plan and the Citibuilder 401(k) Plan for Puerto Rico (collectively, the "Plans"), against the Plans' fiduciaries, including Citigroup.

2.      Plaintiff alleges that Defendants, as fiduciaries of the Plans, breached their duties to him and to the other participants and beneficiaries of the Plans in violation of ERISA, particularly with regard to the Plans' holdings of Citigroup stock.

3.      During the Class period (as defined below), Defendants knew or should have known that Citigroup stock was an imprudent investment alternative for the Plans.  Defendants had intimate knowledge of, and an active role in, the unlawful accounting artifices and other improper activities that allowed Citigroup to artificially inflate and manipulate the Company's earnings.

4.      This action seeks relief on behalf of the Plans, for losses to the Plans, for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3)), Plaintiff seeks other relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

5.      Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for breaches of fiduciary duty on behalf of the Plans, Plaintiff brings this as a class action on behalf of all participants and beneficiaries of the Plans during the Class Period.


## JURISDICTION AND VENUE

6.      **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

7.    **Personal Jurisdiction.**  ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  As all Defendants are either residents of the United States or subject to service in the United States, this Court has personal jurisdiction over them.

8.    **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans are administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district.

## PARTIES

### A.    Plaintiff

9.    Plaintiff is a current employee of Citigroup.  During the Class Period, Plaintiff was, and continues to be, a participant or beneficiary of the Citigroup 401(k) Plan, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a).

### B.    Defendants

#### *Citigroup Defendants*

10.    **Defendant Citigroup** is a Delaware corporation, with its principal executive offices located at 399 Park Avenue, New York, NY 10043.  Citigroup is a global provider of investment banking, financing, wealth management, advisory, asset management, insurance, lending and other related products and services.  During the Class Period, Citigroup common stock traded on the New York Stock Exchange.

11.    Citigroup is the Plans' Sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), and as such, exercises discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.  Citigroup, at all times, acted through its officers, directors and employees, including

members of the Board of Directors' Personnel and Compensation Committee (the "Compensation Committee"), who were appointed by the Company to perform Plans-related fiduciary functions, and did so in the course and scope of their services for the Company.

12.     Citigroup had, upon information and belief, at all applicable times, effective control over the activities of its officers and employees, including their Plan-related activities. Through its Board of Directors (the "Board"), or otherwise, Citigroup had the authority and discretion to hire and terminate said officers and employees. Citigroup also had the authority and discretion to appoint, monitor and remove officers and employees from their individual fiduciary roles with respect to the Plans.

13.     Additionally, by failing to properly discharge their fiduciary duties under ERISA, the officer, director, and employee fiduciaries breached duties they owed to the Plans' participants and their beneficiaries. Accordingly, the actions of the Plans' officers, directors, and other employee fiduciaries are imputed to Citigroup under the doctrine of *respondeat superior*, and Citigroup is liable for these actions.

14.     **Defendant Charles O. Prince** ("Prince") was, at all relevant times, until his resignation from the Company on November 4, 2007, Chairman of the Board, Chief Executive Officer and a Director of Citigroup. Prince signed Citigroup's relevant SEC filings during the Class Period, participated in the day-to-day management and overall direction of the Company, participated in the preparation of the statements alleged herein to be false, and communicated both directly and indirectly with Plans' participants. Prince was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition.

*__Director Defendants__*

15.    **Defendants Prince, C. Michael Armstrong ("Armstrong"), Alain J.P. Belda ("Belda"), George David ("David"), Kenneth T. Derr ("Derr"), John M. Deutch ("Deutch"), Roberto Hernandez Ramirez ("Ramirez"), Klaus Kleinfeld ("Kleinfeld"), Andrew N. Liveris ("Liveris"), Anne Mulcahy ("Mulcahy"), Richard D. Parsons ("Parsons"), Judith Rodin ("Rodin"), Robert E. Rubin ("Rubin")** and **Franklin A. Thomas ("Thomas")** served as members of the Board at all relevant times (the "Director Defendants").

16.    The Board, upon information and belief, has primary fiduciary oversight of the Plans. The Director Defendants are fiduciaries of the Plans within the meaning of ERISA in that they exercise discretionary authority with respect to: (i) the management and administration of the Plans; and/or (ii) the management and disposition of the Plans' assets; and/or (iii) appointing, monitoring, and removing the Plans' fiduciaries.

17.    Because of the Director Defendants' position, they knew the adverse non-public information about the business of Citigroup, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

18.    During the Class Period, the Director Defendants participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

*The Compensation Committee Defendants*

19.    **Defendant Parsons**, in addition to being a member of the Board, served as the Chairman of the Compensation Committee, at all relevant times.  As such, Defendant Parsons was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

20.    **Defendant Ann Dibble Jordan ("Jordan")** served as a Director of Citigroup until her retirement from the Board in 2007.  In addition to being a member of the Board, Defendant Jordan served as a member of the Compensation Committee for at least a portion of the Class Period.  As such, Defendant Jordan was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

21.    **Defendants Belda and Derr**, in addition to being members of the Board, served as members of the Compensation Committee, and as such were fiduciaries of the Plans within the meaning of ERISA, in that they exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

22.    In addition to the Board collectively, the Compensation Committee, upon information and belief, is also a fiduciary of the Plans.  According to the Compensation Committee's charter, it is charged with, *inter alia*, "review [of] employee compensation strategies, benefits and equity programs."  Proxy Statement filed with the SEC on March 13, 2007 (the "2007 Proxy").  The Compensation Committee and its members therein are fiduciaries of the Plans within the meaning of ERISA in that they exercise discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans'

assets. Further, each member of the Compensation Committee, by virtue of their committee position, was a member of the Board and therefore also had fiduciary responsibility to the Plans and their participants in that regard.

### *Administrative Committee Defendants*

23.    **Defendants John Does 1-20 (the "Administrative Committee Defendants")**, at all relevant times, served as members of the Administrative Committee.

24.    At all relevant times, the Administrative Committee Defendants were, upon information and belief, all employees, officers, or directors of Citigroup. The Administrative Committee Defendants were fiduciaries of the Plans within the meaning of ERISA in that they exercised discretionary authority and discretionary control with respect to the Plans' management, administration, investments, and assets.

### *Investment Committee Defendants*

25.    **Defendants John Does 21-40**, at all relevant times, served as members of the Investment Committee of Citigroup.

26.    At all relevant times, the Investment Committee Defendants were, upon information and belief, charged with designating investment funds for the Plans, establishing rules and procedures with respect to the Plans' investment funds and monitoring the performance of the Plans' investments. The Investment Committee Defendants were fiduciaries of the Plans within the meaning of ERISA in that they exercised discretionary authority and discretionary control with respect to the Plans' management, administration, investments, and assets.

I.    **THE PLAN**

A.    **Nature of the Plan**

27.    The Plans are "employee pension benefit plan[s]" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) and defined contribution plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

28.    The Plans are legal entities that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are neither plaintiffs nor defendants. Rather, pursuant to ERISA § 409, 29 U.S.C. §1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plans. Stated differently, in this action Plaintiff seeks relief that is plan-wide.

29.    The Plans cover eligible employees of Citigroup and its subsidiaries and affiliates.

30.    According to the Company's Form 11-K for the fiscal year ended December 31, 2006 (the "2006 Form 11-K"), under the terms of the Plans, Citigroup can match up to 3% of eligible compensation contributed to the Plans, up to an annual maximum Company contribution of $1,500, after one year of service. Eligible employees become 100% vested in the Company's matching contributions after attaining the age of 55 or completing three years of service. The 2006 Form 11-K further provides that "the Company Matching Contributions made to the participants' accounts must stay in the Citigroup Common Stock Fund for five Plan years, unless the participant has attained age 55."

31.    Citibank N.A. ("Citibank") is the trustee of the Plans and holds the Plans' shares of Citigroup stock in a trust established under the Plan. The Plans pay fees, directly or indirectly to Citibank.

**B.    Defendants' Fiduciary Status**

32.    ***Named Fiduciaries***.    ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).    The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.    ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

33.    ***De Facto Fiduciaries***.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.    Thus, a person is a fiduciary to the extent he or she "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

34.    Each of the Defendants was a fiduciary with respect to the Plans and owed fiduciary duties to the Plans and the Plans' participants under ERISA in the manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

35.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plans, and the Plans' investments solely in the interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

36.    Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

37.    ERISA permits the fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries must still in fact act solely in the interest of participants and beneficiaries, not in the interest of the sponsor. Moreover, all Plans' fiduciaries were obliged, when wearing their fiduciary hat(s) to act independently of Citigroup which had no authority to direct the conduct of any of them with respect to the Plans, the Plans' investments, or the disclosure of information between and among fiduciaries or from fiduciaries to the Plans' participants.

## C.    Defendants' Fiduciary Roles

38.    As previously stated, Citigroup is the Plans' Sponsor and Citibank is the Plans' Trustee.

39.    Upon information and belief, the Plans' documents describe Citigroup, the Board, the Compensation Committee, the Administrative Committee and the Investment Committee as named fiduciaries of the Plan.

40.    Upon information and belief, instead of delegating all fiduciary responsibility for the Plans to external service providers, Citigroup chose to internalize at least some of these fiduciary functions.

41.    Upon information and belief, the Plans and their assets are administered and managed by the Compensation, Administrative and Investment Committees (the "Plan Committees"), selected and monitored by the Board.  The Plan Committees exercised broad responsibility for management and administration of the Plans and, among their other duties, were responsible for oversight of the Plans' investment options, policies, and the performance of the Plans' investments, as well as the review of investment managers.

42.    In their capacity to select and monitor investment options for the Plans, the Plan Committees had the discretion and authority to suspend, eliminate, or reduce any Plan investment, including investments in the Citigroup stock.  Upon information and belief, the Plan Committees regularly exercised their authority to suspend, eliminate, reduce, or restructure the Plans' investments. The Plan Committees also reported to the Board of Directors regarding these duties and the Plans' events pertaining to the same.

43.    Upon information and belief, the Plan Committees exercised responsibility for communicating with participants regarding the Plans, and providing participants with information and materials required by ERISA.  In this regard, on behalf of Citigroup and the Director Defendants, the Plan Committees disseminated the Plans' documents and materials.

44.    The Director Defendants are the Plans' fiduciaries to the extent they exercised their authority to select, monitor, retain, and remove the members of the Plan Committees and, accordingly, exercised authority and oversight over the Plan Committees, which reported to the Board regarding the Plan Committees' fiduciary duties and responsibilities to the Plans and with respect to their actions pertaining to the same.

45.     Therefore, the participation in and knowledge of Citigroup's inappropriate and potentially unlawful practices by defendants as alleged herein is imputed and attributed to Citigroup, the Plan Committees, and the Director Defendants.

## CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

47.     All persons who were participants in or beneficiaries of the Plans at any time during the Class Period, i.e., between January 1, 2007 and the present, and whose accounts included investments in Citigroup stock.

48.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plans during the Class Period.[1]

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

---

[1] According to the Company's Form 5500 for the year ended December 31, 2005, there were 157,504 participants of the Plans at the end of the plan year.

(b)     whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

50.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

53.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any

questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

### *I. Company Background*

54.    According to the Company's 10-Q Report for the quarterly period ended September 30, 2007 ("the 3Q'2007 Form"), Citigroup, founded in 1812, "is a diversified global financial services holding company. Our businesses provide a broad range of financial services to consumer and corporate customers." The Company's 3Q'2007 Form further provides that "Citigroup has more than 200 million customer accounts and does business in more than 100 countries."

55.    The Company's Global Consumer segment offers banking, lending, insurance, and investment services. As of March 31, 2007, this segment operated through a network of 8,140 branches, approximately 19,100 automated teller machines, 708 automated lending machines, and the internet.   Citigroup's Markets and Banking segment provides various investment and commercial banking services and products, which comprise investment banking and advisory services, debt and equity trading, institutional brokerage, foreign exchange, structured products, derivatives, and lending.   The Company also offers cash management and trade finance for corporations and financial institutions; custody and fund services to insurance companies and pension funds; clearing services to intermediaries; and depository and agency/trust services to multinational corporations and governments.

56.    Citigroup's Global Wealth Management segment provides investment advice, financial planning, and brokerage services to affluent individuals, companies, and non-profits. This segment also offers wealth management services for high net worth clients. These services

include investment management, such as investment funds management, capital markets solutions, trust, fiduciary, and custody services; investment finance that comprises credit services, such as real estate financing, commitments, and letters of credit; and banking services, which consist of deposit, checking, and savings accounts, as well as cash management and other banking services.

57.    The Company's Alternative Investments segment manages products across five asset classes, such as private equity, hedge funds, real estate, structured products, and managed futures.

## II.    Defendants Knew or Should Have Known That Citigroup Stock Was Not a Prudent Plan Investment as a Result of the Company's Highly Risky and Inappropriate Business Activities

### A.    Defendants Caused the Plans to Invest in Company Affiliated Funds, Thereby Incurring Significantly Higher Fees Than Were Available in the Broader Pension Fund Market

58.    Among other things, Plan Committee Defendants were responsible for selecting investments and service-providers for the Plans, which selections had to be made prudently and solely in the interest of the Plans' participants and beneficiaries.

59.    In contravention of their fiduciary responsibilities, over the course of many years, Plan Committee Defendants placed Citigroup's interests ahead of the Plans' interests by selecting investment products and pension plan services offered and managed by the Company's subsidiaries and affiliates, which generated substantial revenues for Citigroup to the detriment of the Plans.

60.    In particular, Plan Committee Defendants chose mutual funds offered and managed by Smith Barney Fund Management LLC ("Smith Barney") and Salomon Brothers Asset Management Inc. ("Salomon Brothers"), guaranteed insurance contracts ("GICs") and a

Stable Value Fund offered and managed by Travelers Life & Annuity ("Travelers"), trustee services provided by Citibank, and record-keeping and other plan administration services provided by CitiStreet. Each of these entities is (or was) an affiliate or subsidiary of Citigroup during the Class Period.

61.     By selecting Smith Barney and Salomon Brothers mutual funds (hereinafter "Affiliated Funds"), Plan Committee Defendants placed Citigroup's interests above the Plans' interests. Throughout the Class Period, many better-performing, lower-fee mutual funds were available that Plan Committee Defendants could have chosen for the Plans—and did eventually choose after Citigroup sold its mutual fund business and no longer received revenue from the Plans.

62.     Plan Committee Defendants failed, however, to substitute any Affiliated Funds, in which the Plans were invested, while the Plans were generating fees for the Company. Thus, Plan Committee Defendants chose investments to benefit Citigroup, the Plans' sponsor, rather than the Plans' participants and beneficiaries.

63.     During the Class Period, the Plans (collectively) were the largest investors in the Affiliated Funds. For example, the Plans' investment in the institutional share class of the following Affiliated Funds exceeded 50% for most of the Class Period: Smith Barney Aggressive Growth Fund, Smith Barney Appreciation Fund, Smith Barney U.S. Government Securities Fund, Salomon Brothers High Yield Bond fund, and Salomon Brothers CAP Fund. This means that few, if any, institutional investors with assets on the scale of the Plans chose to invest in Affiliated Funds. Stated differently, the large pension plan market did not favor Affiliated Funds, with the exception of the Plans.

64.     Plan Committee Defendants also caused the Plans to invest in GIDs and a Stable Value Fund offered by Travelers, another Citigroup subsidiary, and to contract with Citibank and CitiStreet for trustee and record-keeping services.

65.     During the Class Period, the Plans were routinely invested in Affiliated Funds that charged investment advisory fees that were higher than comparable funds.  For example the following Affiliated Funds charged investment advisory fees that were higher than such fees charged by comparable funds offered by the Vanguard Group, Inc.: Smith Barney Aggressive Growth Fund –52% higher fees than comparable Vanguard fund; Smith Barney Appreciation Fund—50% higher fees than comparable Vanguard fund; Smith Barney U.S. Government Securities Fund—111% higher fees than comparable Vanguard fund; Smith Barney Large Cap Growth Fun—57% higher fees than comparable Vanguard fund; Smith Barney Fundamental Value Fund—37% higher fees than comparable Vanguard fund; Salomon Brothers High Yield Bond Fun—227% higher fees than comparable Vanguard fund; Salomon Brothers CAP Fund—24% higher fees than comparable Vanguard fund; and Salomon Brothers Investors fund—62% higher fees than comparable Vanguard fund.

66.     Citigroup subsidiaries and affiliates, chiefly Smith Barney, Salomon Brothers, Travelers, Citibank, and CitiStreet, received tens of millions of dollars in annual fees for investment advisory, custodial, trust, administrative and other services for the Plans.

67.     Plan Committee Defendants knew or should have known that similar investment funds and retirement plan administration services were available from unaffiliated entities.

68.     The Plans' investments in the Affiliated Funds were prohibited transactions under ERISA, as were the payment of fees to other Citigroup affiliates such as Citibank and CitiStreet.

69.     The Plans have suffered millions of dollars in yearly losses because Plan Committee Defendants forced the Plans to invest billions of dollars in Affiliated Funds, which resulted in millions of dollars of revenue for Citigroup, while delivering poor investment returns for the Plans. ERISA prohibits a plan from investing in the plan sponsor's investment products or paying the plan sponsor fees for services provided to the plan unless the fiduciary or sponsor can prove that the transactions are exempt.   Even if Plan Committee Defendants can prove the transactions are exempt from ERISA § 406, 29 U.S.C. § 1106, ERISA does not permit such arrangements, when they are not solely in the interest of the plan, or when a prudent, un-conflicted fiduciary would choose differently.

70.     Citigroup, as the Plans' sponsor was a party in interest. Citigroup, by and through the actions of its Board, also appointed members of the Plan Committees. Citigroup and the Board knew or should have known that the Plan Committee Defendants were breaching their fiduciary duties under ERISA and engaging in prohibited transactions by causing the Plans to do business with Citigroup subsidiaries and affiliates. In fact, Citigroup and the Board, welcomed and participated in the Plan Committee Defendants' violations of ERISA, and must disgorge all monies received from the Plans and profits earned by the Company thereon.

**B. Defendants Failed to Provide Complete and Accurate Information to Plans' Participants Regarding Citigroup's Exposure to Sub-prime and Structured Securities Markets, While Continuing to Invest the Plans' Assets in Citigroup Stock, When It Was No Longer A Prudent Investment for the Plans**

71.     During the Class Period, in order to maintain the Company's image as a steady earnings performer and as having strong financial growth, Citigroup persistently under-reported the degree of risk posed to its operations by the Company's heavy exposure to the sub-prime mortgages market, including certain collateralized debt obligations (CDOs), as well as other structured credit products and components of the leveraged finance origination market.

72.     By at least January 2007, Citigroup became aware of the rapidly rising subprime loan delinquencies and the significant losses which it would be forced to eventually recognize on its balance sheet.   Nevertheless, the Company failed to disclose its subrime loan losses, and instead continually minimized its reportage of the extent of Citigroup's exposure to the troubled financial markets.

73.     For instance, on January 19, 2007, Defendant Prince boasted in the Company's press release, made part of a related 8-K filing with the SEC announcing the results of the full fiscal year 2006 and the fiscal fourth-quarter 2006, that "[o]ur results were highlighted by double-digit revenue growth in our corporate and investment banking, wealth management and alternative-investment businesses.   In U.S. consumer, we continue to see positive trends from our strategic actions."

74.     During the same day conference call with investors, however, a UBS analyst questioned why loan loss reserves had not changed when there had been a rise in Citigroup's consumer loans.   Citigroup's then Chief Financial Officer ("CFO"), Sallie Krawcheck, reassured investors that:

> [W]e believe that we have adequate reserves, *we believe we have the right level of reserve for what we are seeing in terms of the growth in the portfolio, what we see in terms of the embedded loss in the portfolio*.   And as the environment changes the complexion, the portfolio changes, etc., we review that.   We have I guess to go along with the guys that have the pocket protectors or the Ph.D. guys who look at the reserves and we feel very good, very good about the level of them. (Emphasis added.)

75.     On February 23, 2007, Citigroup filed with the SEC its Form 10-K for the full fiscal year 2006 ("2006 Form 10-K"), which provided the following comments regarding the Company's prospects in the upcoming year:

We enter 2007 with good business momentum, as *we expect to see our investment initiatives generate increasing revenues, and are well-positioned to gain from our balanced approach to growth and competitive advantages.*

*We expect to continue to achieve growth in loans, deposits and other customer activity* resulting from our increased distribution points, expanded product offerings, and the impact from recent targeted acquisitions.

***

*Disciplined capital allocation will remain fundamental to our strategic process and we will have a sharp focus on expense management.*

Although there may be volatility in our results in any given year, over the long term *our revenues are targeted to grow* organically at a mid-to-high-single-digit rate, *with strong expense and credit management driving earnings and earnings per share growth at a faster level.* …

Credit is broadly stable as 2007 begins; however, *we are budgeting for a moderate deterioration of credit in 2007.* In addition, the tax benefits we realized in 2006 will not be repeated in 2007, and we anticipate the effective tax rate to return to a more normalized rate of 30% to 31%, not the 27.3% recorded in 2006. (Emphasis added.)

76.    In commenting on its U.S. Consumer Lending divisions, Citigroup stated in the 2006 Form 10-K that "[p]rovisions for loan losses and for benefits and claims increased primarily on higher credit losses in the Real Estate Lending and auto businesses, partially offset by higher loan loss reserve releases of $63 million in the Real Estate business. Credit losses increased due to volume growth and seasoning in Real Estate, as well as volume growth in Autos."

77.    At the time, Citigroup did not disclose any problems with its subprime loan portfolio. Instead, Citigroup led investors to believe that its subprime loss exposure was minimal by stating that from 2004 to 2005, "[n]on-prime mortgage originations declined 20%, reflecting

the Company's decision to avoid offering teaser rate and interest-only mortgages to lower FICO score customers."

78.    On April 16, 2007, Citigroup reported net income for the fiscal first-quarter 2007 of $5.01 billion, or $1.01 per share.   In a press release announcing the results, Citigroup stated "U.S. consumer revenue growth continued to trend positively, up 6%."   Defendant Prince was quoted as stating:

> We achieved these results while completing our structural expense review, which will help us become a leaner, more efficient organization and lower our rate of expense growth.  As we look ahead, our priorities are clear: we will invest to grow and integrate our businesses, take actions to improve efficiency and lower costs, and continue to build momentum across our franchises.

79.    Citigroup held a conference call with investors on April 16, 2007, to discuss the Company's financial results for the fiscal first-quarter of 2007.   When questioned by an analyst as to whether $9 billion worth of loans held by Citigroup were no documentation or low documentation subprime loans, Citigroup's CFO would not answer the question and implied that said loans were profitable:

> Glenn Schorr, Analyst, USB: Thanks, it is USB.  On slide 6, the U.S. consumer mortgage trend, in the footnote, you noted that it excludes $5 billion of first mortgages and almost $4 billion of second mortgages where you didn't have FICO and LTV data. Just curious on what type of loans that might be, why you don't have the data and how your gut is that that might change the results that you showed on the slide?
>
> Gary Crittenden: We actually just finished preparing this data over the course of the last week or so and we don't have a comprehensive view that includes all of the –the full scope of the portfolio.  The underlying delinquency performance of the things that were excluded from the table have very good delinquency performance associated with them.  So there was no – if you look at the underlying performance of those mortgages that were excluded from the table with those that are included, there was just

> no underlying difference in the delinquency performance between
> the two.
>
> Glenn Schorr: Got you.  I would guess it is probably stuff that falls
> into that all [pay] no [doc]/low doc type of --.
>
> Gary Crittenden: You know, we don't use that nomenclature here
> and don't think about the business in that way.
>
> Glenn Schorr: Okay.  But you don't have FICO and LTV scores on
> the loans?  Okay.  I'm good.  I don't need a follow up.  Thanks.

80.    In the April 16, 2007 conference call, Defendant Prince told analysts that he was

pleased the bank had achieved "positive operating leverage" in the first quarter, with revenue up

12% more than the 10% rise in expenses, in an attempt to please investors who had been pressing

for expense control.  "It feels good to me to see that progress," Defendant Prince said.  "We are

delivering on our plan."

81.    Citigroup's comments about its operations led investors to believe that

Citigroup's subprime loan loss exposure was minimal.  On April 16, 2007, for instance,

*CNNMoney.com*, in an article entitled, "Stocks Soar on Earnings, Deals," quoted Paul Nolte,

director of investments at Hinsdale Associates, a money management firm, as stating, "[o]ne of

the question marks coming into earnings season has been the mortgage issue, and Citigroup

making positive comments about its business has lent some strength to the overall market."

82.    On May 4, 2007, Citigroup filed its Form 10-Q for the first quarter ended March

31, 2007, which provided in pertinent part:

> Credit costs increased $1.3 billion from a year ago, primarily
> driven by an increase in net credit losses of $509 million and a net
> charge of $597 million to build loan loss reserves.  The $597
> million net build compares to a net reserve release of $154 million
> in the prior-year period.  The build was primarily due to increased
> reserves to reflect: a change in estimate of loan losses inherent in
> the initial tenor portion of the Consumer Loan Portfolio; portfolio
> growth, and increased delinquencies in second mortgages, in the

U.S. Consumer Lending mortgage portfolio; and portfolio growth in Markets & Banking, which includes higher commitments to leveraged transactions and an increase in average loan tenor. The Global Consumer loss rate was 1.69%, a 23 basis-point increase from the first quarter of 2006.

83.     On June 20, 2007, the financial press reported that two Bear Stearns hedge funds that held more than $20 billion of investments, mostly in complex securities made up of bonds backed by subprime mortgages were close to being shit down as a rescue plan fell apart in a drama that could have wide-ranging consequences for Wall Street and investors.

84.     On this news, investors correctly surmised that Citigroup may have similar problems, and the Company's common stock fell from its close of $54.26 on June 19, 2007 to close at $51.15 on June 25, 2007 – a 5.7% decline in less than a week.

85.     In the June 20, 2007 conference call with investors discussing its fiscal second-quarter 2007 results, Citigroup was forced to reveal that it had been actively managing down its subprime exposure "some time" and had reduced its exposure "over the last six months." During the second quarter of 2007, Citigroup's profits from consumer banking fell 15%, to $42.7 billion as credit costs increased by $934 million. Citigroup increased its loan loss reserves by $465 million citing higher delinquencies in consumer lending. Citigroup also announced its expectation of seeing continued deterioration in consumer-credit quality through the year's second half, and Citigroup probably will make "meaningful additions" to its loss reserves.

86.     After Citigroup reported that it will probably suffer meaningful losses in the second half of 2007, its stock plummeted over the next week from a close of $51.19 on July 19, 2007 to a close of $46.97 on July 27, 2007 – an 8.2% decline, wiping out approximately $20 billion in market share.

87.    On August 3, 2007, Citigroup filed its Form 10-Q for the fiscal second-quarter ended June 30, 2007. Citigroup reported in part:

> Credit costs increased $934 million or 59%, primarily driven by an increase in net credit losses of $259 million and a net charge of $465 million to increase loan loss reserves. The $465 million net charge compares to a net reserve release of $210 million in the prior-year period. The build in U.S. Consumer was primarily due to increased reserves to reflect: higher delinquencies in second mortgages in U.S. Consumer Lending, a change in estimate of loan losses inherent in the U.S. Cards portfolio, and portfolio growth.

88.    On October 1, 2007, as previously warned, Citigroup announced that dislocations in the mortgage-backed securities and credit markets, and deterioration in the consumer credit environment were expected to have an adverse impact of fiscal third-quarter financial results. Citigroup estimated that it would report a decline in net income in the range of 60% from the prior-year quarter, subject to finalizing third-quarter results. The Company's stated losses included a $1.4 billion write-off in Citigroup's $57 billion portfolio of highly leveraged loans, and a loss of $600 million in fixed-income credit trading. Citigroup also announced that consumer credit costs rose $2.6 billion, mostly due to a boost in loan-loss reserves. Citigroup's shares actually rallied after the October 1, 2007 profit warning, as investors were cheered by Defendant Prince's comments that markets were recovering and Citigroup expected a "return to a normal earnings environment in the fourth quarter."

89.    A mere two weeks later, on October 15, 2007, Citigroup reported its poor financial results for the fiscal third-quarter 2007 and announced write-offs that were half a billion dollars more than the Company had forecast only two weeks earlier. Citigroup's third-quarter results included a $1.35 billion pretax write-down in the value of leveraged loans, $1.56 billion of pretax losses tied to loans and subprime mortgages that were to be repackaged and sold to

investors, $636 million in pretax fixed-income trading losses and $2.98 billion in increased consumer-credit costs.

90.     On October, 13, 2007, the financial press reported that a number of banks, including Citigroup, had discussions with the United States Treasure Department regarding the formation of a super fund to create liquidity for Structured Investment Vehicles ("SIVs") and conduits, both of which are entities that banks use to issue commercial paper, that were facing liquidity problems. According to reports, many investors had ceased buying commercial paper sold by these structures because they were concerned that the vehicles were exposed to subprime loans. As a result, the vehicles could not raise proceeds to pay off their debts. Also, the vehicles could not immediately sell their assets without suffering a loss.

91.     The purpose of the proposed super fund was to purchase the troubled SIVs' assets and eventually resell them in an effort to prevent discount fire sales. On October 15, 2007, *The Wall Street Journal* (the "Wall Street Journal"), in an article entitled "Rescue Readied By Banks Is Bet To Spur Market," reported that "[s]ome bankers objected to the plan, calling it an escape hatch for Citigroup, which has more SIVs than any other bank." According to a *Reuters* article, dated October 21, 2007, and entitled "Banks Launch Reform Drive in Wake Of Credit Crisis" (the "Reuters Article"), "[s]ome bankers have criticized the U.S. fund rescue plan as inappropriate because it risked dragging out problems instead of tackling them head-on." The *Reuters* Article provided that Deutsche Bank AG's chief executive officer, Josef Ackermann, rejected the idea and advised financial actors burdened with illiquid assets to write down their value now while the financial sector was strong and not to drag any uncertainty that has made banks become fearful to lend to one another.

92.    On October 16, 2007, *US Fed News*, in an article entitled "Secretary Paulson Speaks on Current Housing and Mortgage Market Developments," reported that Henry M. Paulson, Jr., U.S. Treasury Secretary, said that the conduct of some mortgage market participants had been "shameful" and called for consideration of a nationwide licensing and monitoring system for mortgage brokers.  Mr. Paulson also warned caution over banks' exposure to off-balance sheet vehicles, such as Citigroup's conduit vehicles.  Mr. Paulson stated that "[o]ur bank regulators must evaluate regulatory capital requirements applicable to bank exposures to off-balance sheet vehicles," and that the U.S. Treasury would "review the accounting rules" for these special purpose entities. *Id.*

93.    In connection with the SIV reports, on October 17, 2007, the *Wall Street Journal*, in an article entitled "Post-Enron Rule Changes Kept Banks' Risks in Dark – Investors Still Found It Hard to Figure Out What Was Going On," reported that Citigroup "has nearly $160 billion in SIVs and conduits, but its shareholders wouldn't get a clear view of this from reading the bank's balance sheet."

94.    After the Company disclosed $500 million in additional losses and media reports surfaced about Citigroup's potential multi-billion dollar exposure to off-balance-sheet SIVs and conduits, Citigroup's common stock price fell from a close of $47.87 on Friday, October 12, 2007, to a close of $46.24 on October 15, 2007 – a 3.4% decline.  The Company's stock price continued to tumble over the next few days to $42.61 on October 19, 2007 – a 10.9% decline – wiping out approximately $25 billion in market value over a 5 day period.

95.    Citigroup's shares fell another 6.8% on November 1, 2007 after Credit Suisse and CIBC World Markets downgraded the Company's stock on concern that Citigroup might have to cut its dividend to boost its capital, amid reports that Citigroup would be required to disclose

billions more in losses. Citigroup shares fell $2.85 to $38.51, their lowest level since May 2003 and their biggest one-day drop since September 2002.

96.     On November 2, 2007, after the market closed, the financial press reported that Citigroup's Board would hold an emergency meeting over the weekend, where Defendant Prince would resign.

97.     On November 3, 2007, the *Wall Street Journal*, in an article entitled "Citigroup CEO Plans to Resign As Losses grow – Bank's Board to Meet With Prince on Sunday; SEC Queries Accounting," reported that "[t]he SEC [was] reviewing how Citigroup accounted for certain off-balance-sheet transactions that are at the heart of a banking-industry rescue plan, according to people familiar with the matter." The article also reported that "[t]he SEC is also taking a broad look at how brokerage firms valued assets tied to high-risk mortgages and whether they were timely in their disclosure of losses to investors." *Id.*

98.     The next day, on November 4, 2007, the Company made a startling announcement in its Form 8-K filing with the SEC, that it sustained "***significant declines since September 30, 2007 in the fair value of the approximately $55 billion in U.S. sub-prime related direct exposures in its Securities and Banking (S&B) business***," and that Citigroup "***estimates that, at the present time, the reduction in revenues attributable to these declines ranges from approximately $8 billion to $11 billion***." (Emphasis added.) These new loss estimates were far greater than the approximately $2.2 billion in mortgage-related writedowns and trading losses that Citigroup reported in its fiscal third-quarter earnings, the previous month.

99.     This shocking news was followed on the same day by Defendant Prince's announcement that he was leaving the Company. On November 5, 2007, *Forbes.com*, in an

article entitled "Citi is a Mess," commenting on Defendant Prince's departure from Citigroup,

reported that:

> Citigroup has confirmed what the markets had widely feared: ***things are worse than they looked at the end of September***.
>
> The bank is taking another $8 billion to $11 billion hit to revenues because of "significant" declines in the $55 billion or so in the U.S. subprime mortgage exposure it has in the securities business. That adds up to a profit cut of $5 billion to $7 billion.
>
> ***Not surprisingly, this has cost Charles Prince his job as chief executive officer***, a move many have been anticipating all weekend. In a statement Sunday night, ***Prince said "it is my judgment that given the size of the recent losses in our mortgage-backed securities business, the only honorable course for me to take as chief executive officer is to stop down. This is what I advised the board."***
>
> In a memorandum to employees, Prince, who is characterizing his departure as retirement, said he was announcing it "with sadness."
>
> ***He went on to take responsibility for the more than $3 billion in subprime-related writed-downs in the third quarter, particularly in the credit derivatives known as collateralized debt obligations, which sent profits plummeting 57% from the same period last year.***
>
> "***As you have seen publicly reported, the rating agencies have recently downgraded significantly certain CDOs and the mortgage securities contained in the CDOs. As a result of these downgrades, valuations for these instruments have dropped sharply. This will have a significant impact on our fourth quarter financial results***," Prince told employees. "***I am responsible for the conduct of our businesses.***"
>
> This announcement came after Citi's board met Sunday and after days of intensifying pressure on Prince and the board over the bank's handling of its credit derivatives exposures during the summer's market meltdown. (Emphasis added.)

100.    After the market opened on November 5, 2007, Citigroup's stock fell to $35.60.

101.    On November 6, 2007, the *Wall Street Journal*, in an article entitled "Repairing a Citi Machine" ("November 6, 2007 Article"), reported that Prince's replacement would face substantial challenges in cleaning up the Company's financial mess caused by its unorthodox investment strategies:

> One day after the departure of Chief Executive Charles Prince, Citigroup Inc. ***officials said it will take the bank until the middle of next year to clean up its problems caused by credit-market turmoil.***
>
> ***Investors made it clear they think the largest bank in the U.S. by assets will need much longer than that.***  As it became clearer how the bank's problems have deepened in recent weeks, they sent Citigroup's stock down 4.9% yesterday…
>
> ***The Citigroup shares yesterday reached their lowest level since April 2003,*** falling $1.83 to $35.90 in 4 p.m. composite trading on the New York Stock Exchange.  Since the debt-market turmoil erupted in August, Citigroup's market value has dropped nearly $50 billion, and since the start of the year the shares are down 36%.
>
> ***Citigroup's new woes underscored for many investors that the fallout from credit-market turmoil will likely continue for longer than many expected***.  Counting Citigroup's potential new losses, banks and investment houses will have racked up combined losses of more than $30 billion because of mortgage-and debt-market problems. …
>
> ***
>
> ***Citigroup has been weighed down for months by investors' concerns about its leadership, financial flexibility and corporate strategy.  Besides its exposure to subprime mortgages, Citigroup is also facing problems with off-balance-sheet vehicles that are now the focus of a possibly $100 billion industry rescue attempt***.
> (Emphasis added.)

102.    The *Wall Street Journal* November 6, 2007 Article also noted that the news of Citigroup's multibillion dollar losses, stemming from the Company's risky investment strategy, caused a number of Wall Street analysts to predict continued heavy losses in the upcoming

reporting periods as well as to voice serious concerns the lack of proper risk-management controls

at the Company:

> *Citigroup's mounting woes led to several reversals in the past week among Wall Street analysts who had been optimistic about the bank keeping up with rivals.  Morgan Stanley's Betsy Graseck, citing concerns about the firm's risk-management procedures, yesterday told clients to "sell into any rally" in Citigroup stock.*
>
> Chief Financial Officer Gary Crittenden, on a conference call with analysts yesterday, acknowledged that the $8 billion to $11 billion in losses flagged by the bank are an estimate of write-downs that may be needed.  *The bank "can't give any assurance" that the loss won't grow as the quarter progresses*, he added.
>
> *Analysts are bracing for the worst.  "We wouldn't be surprised if additional write-downs were forthcoming,"* Goldman Sachs analyst William Tanona wrote in a note to investors.
>
> *Investors were particularly unnerved by the fact that Citigroup announced the possibility of additional write-downs just weeks after it said third-quarter losses due to the bank's subprime exposure would be $1.56 billion.  The new, vastly bigger losses called into question the bank's ability to measure its holdings and the information it was providing to markets.*
>
> Mr. Crittenden *said potential fourth-quarter losses were sparked by downgrades of mortgage-backed securities in October.* ...
> (Emphasis added.)

103.    Furthermore, in the wake of Citigroup's November 4, 2007 announcement,

questions emerged, not just over Defendant Prince's misguided leadership of Citigroup, but also

over the Board's lack of proper oversight of the Company operations.  For instance, in the

November 6, 2007 Article, the *Wall Street Journal* reported that:

> Mike Mayo, *an analyst at Deutsche Bank* who rates Citigroup's stock a "sell," *questioned why investors weren't given information about the bank's CDO holdings earlier and whether Citigroup's board was aware of their potential for losses.  He asked on the Citigroup conference call* yesterday *what the board*

***did, if it knew, and why it didn't disclose the potential problems***.
(Emphasis added.)

104.    The *Associated Press*, in an article entitled "What Do We Expect of Boards," also commented negatively on the makeup of the Citigroup's Board, particularly on the lack of succession planning for top executive officers and on the number of directors who are simultaneously serving as CEOs of other companies:

> *[T]here are reasons to criticize the behavior of Citigroup's and Merrill's directors. For one thing, succession planning left much to be desired* at both financial services giants, where top lieutenants in recent years left on their own or by request. Both banks are now conducting hastily organized searches for replacements.
>
> Meanwhile, *Monday's Wall Street Journal cited good-governance types criticizing the makeup of Citigroup's board. Many directors are themselves CEOs, who due to that status are perceived to emphasize too much with the CEO they oversee. That could mean lax oversight and too little restraint when it comes to compensation. There also is little formal financial services experience on the Citigroup board*. (Emphasis added.)

105.    Plaintiff and other Class members owned Citigroup stock in their Plan accounts and have suffered substantial losses. According to the 2006 Form 11-K, as of December 31, 2006, the Citigroup 401(k) Plan held approximately $4.13 billion of Citigroup common stock, which amounted to 32% of the plan's total assets. Based on public trading data relating to the price of Citigroup's securities, it appears that Defendants' breaches of fiduciary duties have caused the Plans to lose well over $1.3 billion dollars in retirement savings during the Class Period.

106.    During the Class Period, as described herein, Defendants knew or should have known that Citigroup stock was an imprudent investment for the Plans due to the fact that Citigroup (i) lacked appropriate internal controls to ensure the accuracy of its financial reporting

and the estimates of its future financial performance to such an extent that it could not meet its disclosure obligations under the securities laws and (ii) was significantly misstating the amount of write-downs due to the losses caused by the Company's heavy exposure to sub-prime mortgages and leveraged financing operations. As a result of these undisclosed facts, Citigroup's stock price was artificially inflated making it an imprudent investment for the Plans.

107.    Upon information and belief, Citigroup regularly communicated with employees, including Plans' participants, about the Company's performance, future financial and business prospects and Citigroup stock. During the Class Period, upon information and belief, the Company fostered a positive attitude toward Citigroup stock as a Plan investment, and/or allowed Plans' participants to follow their natural bias toward remaining invested in the stock of their employer, even after divestiture was possible, by not disclosing negative material information concerning investment in Citigroup stock. As such, Plans' participants could not appreciate the true risks presented by investments in Citigroup stock and therefore could not make informed decisions regarding their investments in the Plans.

## CAUSES OF ACTION

### COUNT I

*Failure to Prudently and Loyally
Manage the Plans and Plans' Assets*

*(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)*

108.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

109.    At all relevant times, as alleged above, Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

110.    As alleged above, Defendants were all responsible, in different ways and to differing extents, over management of the Plans or disposition of the assets of the Plans and were, during the Class Period, responsible for ensuring that both the (1) investment management fees paid to the Plans' service providers and (2) the Plans' investment options, including Citigroup Stock Fund, made available to participants in the Plans, were prudent.

111.    Defendants, by their actions and omissions in authorizing or causing the Plans to invest in the Affiliated Funds and purchase Citigroup-affiliated products and services, and pay, directly or indirectly, investment management and other fees in connection therewith, caused the Plans to engage in transactions that Defendants knew or should have known constituted sales or exchanges of property between the Plans and parties in interest, the furnishing of services by parties in interest to the Plans, and transactions with fiduciaries in violation of ERISA §§ 406(a)(1)(A), (C) and 406(b), 29 U.S.C. §§ 1106(a)(1)(A), (C), and (b).

112.    Furthermore, under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Thus, Defendants were responsible for ensuring that all investment in Citigroup stock under the Plans was prudent, and are liable for losses incurred as a result of such investments being imprudent.

113.    Additionally, pursuant to ERISA, fiduciaries are required to disregard plan documents or directives they know or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, fiduciaries may not blindly follow plan documents or directives that would

lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

114.    Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

115.    According to the DOL regulations and case law interpreting ERISA § 404, a fiduciary's investment or investment course of action is prudent if:  a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and b) he has acted accordingly.

116.    Again, according to DOL regulations,  "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such  portion of the portfolio:

    o   The composition of the portfolio with regard to diversification;

    o   The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    o   The projected return of the portfolio relative to the funding objectives of the plan.

117.    Given the conduct of the Company as described above, Defendants could not possibly have acted prudently when they continued to invest the Plans' assets in Citigroup stock because, among other reasons:

- Defendants knew of and/or failed to investigate the undue exposure of the Company's operations to sub-prime mortgages and leveraged financing that made Citigroup stock an extremely risky, artificially inflated, and imprudent investment for the Plans;

- The risk associated with the investment in Citigroup's stock during the Class Period was an extraordinary risk, far above and beyond the normal, acceptable risk associated with investment in company stock;

- This abnormal investment risk could not have been known by the Plans' participants, and Defendants were aware or should have been aware that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it; and

- Knowing of this extraordinary risk, and knowing the participants were not aware of it, Defendants had a duty to avoid permitting the Plans or any participant from investing Plans' assets in Citigroup stock.

118.    Defendants breached their duties to prudently and loyally manage the Plans' assets. During the Class Period, Defendants knew or should have known that Citigroup stock was not a suitable and appropriate investment for the Plans as described herein. Nonetheless,

during the Class Period, Defendants continued to invest the Plans' assets in Citigroup stock and to direct and approve the ongoing, automatic investment of the future Company contributions in Citigroup stock, instead of other, more suitable, investments. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plans, and indirectly the Plans' participants and beneficiaries, from suffering losses as a result of the Plans' investment in Citigroup stock

119.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

120.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants named in this count, are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II

### *Failure to Provide Complete and Accurate Information to Participants and Beneficiaries*

### *(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by All Defendants)*

121.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

122.    As alleged above, during the Class Period, all Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

123.    As alleged above, the scope of the fiduciary responsibilities of all Defendants, to differing extents, included disseminating Plans' documents and/or Plan-related information to participants regarding the Plans and/or assets of the Plans.

124.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plans or the Plans' assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans.

125.    This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing false information or concealing material information regarding the fees paid out by the Plans or the prudence of maintaining investment in the Plans, so that participants can make informed decisions with regard to their investment options available under the Plans.

126.    This fiduciary duty to honestly communicate with participants is designed not merely to inform participants and beneficiaries of conduct, including potentially illegal conduct, bearing on their retirement savings, but also to forestall such misconduct in the first instance. By failing to discharge their disclosure duties, Defendants facilitated the misconduct in the first instance.

127.    Defendants breached their fiduciary duties by failing to provide the Plans' participants with complete and accurate information regarding the Plans' transactions with the Affiliated Funds, namely that the investment management and other related fees paid to Citigroup subsidiaries and affiliates constituted prohibited sales of exchanges of property pursuant to ERISA.

128.    Furthermore, Defendants breached their fiduciary duties by failing to provide the Plans participants with complete and accurate information regarding the Company's unduly high

level of exposure to sub-prime mortgages and leveraged financing operations, and the consequent artificial inflation of the value of Citigroup stock, and, generally, by conveying inaccurate information regarding the soundness of the Company's financial health and the prudence of investing retirement contributions in the Company stock.

129.    Had the Defendants not constantly reinforced the safety, stability and prudence of investment in Citigroup stock during the Class Period, Plans' participants, to the extent they were permitted, could have divested their holdings of Company stock in the Plans or at least diversified such holdings, thereby mitigating the Plans' losses.

130.    Defendants in this Count are also liable as co-fiduciaries because they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding (1) the investment management and other related fees paid by the Plans to Affiliated Funds and (2) Citigroup stock, despite knowledge of their breaches.  Further, they enabled such conduct as a result of their own failure to satisfy their fiduciary duties and as a result of having knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to Plans' participants, yet not making any effort to remedy the breaches.

131.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment.  Here, the above-described statements, acts and omissions of the Defendants in this Count constituted misrepresentations and omissions that were fundamentally deceptive concerning the (1) payment of investment management and related fees to the Affiliated Funds and (2) prudence of investing the Plans' assets in Citigroup

stock, and were material to any reasonable person's decision about whether or not to invest or maintain any part of their retirement assets in Citigroup Stock Fund during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of Defendants named in this Count.

132.    Plaintiff further contends that the Plans suffered a loss, and Plaintiff and the other Class members suffered losses, by the above-described conduct of Defendants named in this Count during the Class Period because that conduct fundamentally deceived Plaintiff and the other Class members about the prudence of making and maintaining retirement investments in Citigroup stock, and that, in making and maintaining investments in Citigroup stock, Plaintiff and the other Class members relied to their detriment upon the materially deceptive and misleading statements, acts and omissions of Defendants named in this Count.

133.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses. If Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiff and the other Plans' participants, lost a significant portion of their retirement savings.

134.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

### *Failure to Monitor Fiduciaries*

### *(Breaches of Fiduciary Duties in Violation of ERISA § 404*
### *by Citigroup and the Director Defendants)*

135.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

136.     This Count alleges fiduciary breach against the following Defendants: Citigroup and the Director Defendants (the "Monitoring Defendants").

137.     As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

138.     As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other Plan fiduciaries, including the Plan Committee Defendants.

139.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

140.     The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the

information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

141.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

142.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Citigroup stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge and unjustified risk of significant investment loss by rank and file employees in their Plan accounts.

143.    In addition, the Monitoring Defendants, in connection with their monitoring and oversight duties, were required to disclose to those they monitored accurate information about the financial condition and practices of Citigroup that they indisputably knew or should have known that these Defendant-fiduciaries needed to make sufficiently informed fiduciary investment decisions. This is especially true due to the Company's myriad inappropriate investment practices, which most, if not all, Monitoring Defendants had direct knowledge of, if not complicity in. By remaining silent and continuing to conceal such information from the other fiduciaries, the Monitoring Defendants breached their fiduciary duties under the Plan and ERISA.

144.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in the fiduciary breaches by the monitored defendants, they enabled the breaches by these defendants and they had knowledge of these breaches, yet did not make any effort to remedy the breaches.

145.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

146.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT IV

### *Breach of Duty to Avoid Conflicts of Interest*

### *(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by All Defendants)*

147.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

148.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

149.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

150.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occurred by (i) investing the Plans' assets into the Affiliated Funds; (ii)

failing to engage independent fiduciaries and/or advisors who could make independent judgments concerning the Plans' investment in Citigroup stock and the information provided to participants and beneficiaries concerning it, (iii) failing to notify appropriate federal agencies, including the DOL, of the facts and transactions which made Citigroup stock an unsuitable investment for the Plans; (iv) failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served in order to prevent drawing attention to the Company's inappropriate investment practices; and (v) by otherwise placing the interests of the Company and themselves above the interests of the participants with respect to the Plans' investment in Citigroup stock.

151.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

152.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants named in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**COUNT V**

***Co-Fiduciary Liability***

***(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405
by Citigroup and the Director Defendants)***

153.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

154.    This Count alleges co-fiduciary liability against the following Defendants: Citigroup and the Director Defendants (the "Co-Fiduciary Defendants").

155.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

156.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

157.    **Knowledge of a Breach and Failure to Remedy**: ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if it has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach. Citigroup and the Director Defendants knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's true level of exposure to losses stemming from the sub-prime mortgages and leveraged financing deals to the other fiduciaries.

158.    Citigroup, through its officers and employees, engaged in highly risky and inappropriate business practices, withheld material information from the market, provided the market with misleading disclosures, and profited from such practices, and, thus, knowledge of such practices is imputed to Citigroup as a matter of law.

159.    The Director Defendants, by virtue of their positions at Citigroup, participated in and/or knew about the Company's highly risky and inappropriate business practices, and their consequences, including the artificial inflation of the value of Citigroup stock.

160.    Because Citigroup and the Director Defendants knew of the Company's improper business practices, they also knew that the Plan Committee Defendants were breaching their duties by (i) investing the Plan in Affiliated Funds, which were charging higher management fees than other available funds; (ii) continuing to invest the Plans' assets in Citigroup stock when it was no longer prudent to do so, and (iii) providing incomplete and inaccurate information to Plans' participants.  Yet, Citigroup and the Director Defendants failed to undertake any effort to remedy these breaches.  Instead, they compounded them by downplaying the significance of Citigroup's exposure to the sub-prime mortgage market and leveraged financing, and obfuscating the risk that the Company's investment practices posed to Citigroup, and, thus, to the Plans.

161.    **Knowing Participation in a Breach:**  ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.  Citigroup knowingly participated in the fiduciary breaches of the Plan Committee Defendants in that it benefited from the sale or contribution of its stock at artificially inflated prices.  Citigroup also, as a *de facto* fiduciary, participated in all aspects of the fiduciary breaches of the other defendants.  Likewise, the Director Defendants knowingly participated in the breaches of the Plan Committee Defendants because, as alleged above, they had actual knowledge of the Company's improper and possibly illegal conduct and yet, ignoring their oversight responsibilities (as Directors), permitted the Plan Committee Defendants to breach their duties.

162.    **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

163.    Citigroup's and the Director Defendants' failure to monitor the Plan Committee Defendants enabled those committees to breach their duties.

164.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement savings.

165.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

166.    The Plans suffered millions of dollars in losses because a significant percentage of the Plans' assets were imprudently invested or allowed to be imprudently invested by Defendants in Citigroup stock during the Class Period, in breach of Defendants' fiduciary duties. This loss was reflected in the diminished account balances of the Plans' participants.

167.    Defendants are liable for the Plans' losses in this case because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants withheld material, non-public facts from participants, and provided inaccurate and incomplete information to them regarding the true health and ongoing profitability of Citigroup, and its soundness as an

investment vehicle. As a consequence, participants did not exercise independent control over their investments in the Citigroup stock, and Defendants remain liable under ERISA for losses caused by such investment.

168.     Had Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Citigroup stock, eliminating Citigroup stock as the primary investment alternative when it became imprudent, and divesting the Plans of their holdings of Citigroup stock when maintaining such an investment became imprudent, the Plans would have avoided a substantial portion of the losses that they suffered through their continued investment in Citigroup stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

169.     Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the assets of the Plans should not have been so heavily invested in Citigroup equity during the Class Period.

170.     As a consequence of the Defendants' breaches, the Plans suffered significant losses.

171.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan.. ..." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate. ..."

172.     With respect to calculation of the losses to the Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have made or maintained its investments in the challenged investment and, where alternative investments

were available (as they were here, in the equities of other Companies), that the investments made or maintained in Citigroup stock would have instead been made in the most profitable alternative investment available.   In this way, the remedy restores the Plans' lost value and puts the participants in the position they would have been in if the Plans had been properly administered.

173.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and interests on these amounts, as provided by law; and (5) such other legal or equitable relief as may be just and proper.

174.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans in this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits

the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.    Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An Order that Defendants allocate the Plans' recoveries to the accounts of all participants who had their accounts invested in the common stock of Citigroup maintained by the Plans in proportion to the accounts' losses attributable to the precipitous decline in the stock of Citigroup equity;

H.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.    An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants, including appropriate modifications to the Plans to ensure against further violations of ERISA.

DATED: November 19, 2007                **HARWOOD FEFFER LLP**

BY:    Robert I. Harwood (RH-3287)
Samuel K. Rosen (SR-3286)
488 Madison Avenue
New York, New York 10022
Telephone:  (212) 935-7400
Facsimile: (212) 753-3630

Attorneys for Plaintiff

OF COUNSEL:

Lionel Z. Glancy, Esq.
GLANCY BINKOW & GOLDBERG  LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067

Howard G. Smith
LAW OFFICES OF HOWARD G. SMITH
3070 Bristol Pike, Suite 112
Bensalem, Pennsylvania 19020